# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59778-1-II |
| Respondent, | |
| v. | |
| WILLIAM HUDSON, | UNPUBLISHED OPINION |
| Appellant. | |

VELJACIC, A.C.J. – William Hudson appeals his convictions and sentence for two counts of felony violation of a court order and one count of burglary in the first degree. On appeal, he argues: (1) that there was insufficient evidence to support his convictions, (2) that he received ineffective assistance of counsel because his attorney did not argue a mitigating factor at sentencing, (3) that the sentencing court failed to exercise its discretion to impose a downward exceptional sentence under RCW 9.94A.535(1)(a), and (4) that the sentencing court abused its authority by imposing a sentence that exceeded the statutory maximum for felony violation of a court order.

We conclude that: (1) there was sufficient evidence to support Hudson's convictions for felony violation of a court order and burglary in the first degree, (2) Hudson's ineffective assistance of counsel claim fails because he cannot demonstrate prejudice, (3) assuming without deciding that the sentencing court's decision to not consider the mitigating factor outlined under RCW 9.94A.535(1)(a) was error, it was harmless, and (4) Hudson's argument regarding the sentencing

court exceeding its authority by imposing a sentence that exceeded the statutory maximum for felony violation of a court order is moot. Accordingly, we affirm Hudson's convictions and sentence.

FACTS

I.     BACKGROUND

Hudson met Valencia John in 2001. They were romantically involved, but never married. In 2003, John and Hudson were living together, and John gave birth to their daughter, Faith Hudson.[1]

On September 26, 2018, the Pierce County Superior Court granted John a protection order that included, among others provisions, the following:

> 1. [Hudson] is *restrained* from causing [John and Faith] physical harm, bodily injury, assault, including sexual assault, and from molesting, harassing, threatening, or stalking.
> . . . .
> 3. [Hudson] is *restrained* from coming near and from having any contact whatsoever, in person or through others, by phone, mail, or any means, directly or indirectly, except for mailing or service of process of court documents by a 3rd party or contact by [John's] lawyer(s) with [John]. . . . If both parties are present, [Hudson] shall leave.
> 4. [Hudson] is *excluded* from [John's residence and workplace].[2]
> . . . .
> 6. [Hudson] is *PROHIBITED* from knowingly coming within, or knowingly remaining within 1,500 feet [of John's residence and workplace].

Ex. 4B, at 2 (emphasis in the original). While Hudson was not present at the hearing, he was personally served with the order.

---

[1] Because Faith and William share a last name, we will refer to Faith by her first name. No disrespect is intended.

[2] John's address listed in the no-contact order was the same address John and Faith were living at on the March 7, 2023, incident.

The no-contact order was effective until September 26, 2023. At some point prior to the incident leading to the charges at issue, Hudson asked John "to get rid of the order." 4 Rep. of Proc. (RP) at 291. John did not take any action to revoke the order.

II.     THE MARCH 7 INCIDENT

On March 7, 2023, John was living with Faith in a two-bedroom apartment in University Place. John and Faith were the only people living at the apartment.[3] Around 8:00 p.m. that evening, Hudson came over to John's residence. John was folding laundry in her bedroom. Hudson was also in the bedroom. John got into an argument with Hudson about him "not lifting a hand to help in anything concerning the house." 4 RP at 284. Hudson moved closer to John and proceeded to sit on her bed.

After John expressed her disappointment in Hudson, their verbal argument escalated into a physical altercation. As John was standing next to Hudson, he elbowed John in her left midsection. The two exchanged "some more words," and then Hudson grabbed John by her shirt's collar. Faith, who was standing outside John's bedroom, went inside the bedroom and "wedged herself in between" John and Hudson.[4] 4 RP at 288. When Faith intervened, Hudson "attempted to reach for [Faith's] neck." 4 RP at 205. It was unclear whether Hudson actually grabbed Faith's neck, but Faith "[p]ushed [Hudson's] hand out of the way." 4 RP at 206.

Within approximately five minutes of the altercation, Faith called 911. Hudson left before officers arrived at John's residence. Faith also left the residence.

---

[3] The record is unclear whether Hudson was living with John and Faith temporarily or just visiting on March 7, 2023.

[4] Faith's bedroom was close to John's bedroom. Faith heard John and Hudson arguing, and she got closer to John's room to observe the argument.

Officers Derek Nielsen and Steven Pound arrived at the scene around 9:15 p.m. After securing the premises, Nielsen and Pound talked with John. John had "a red mark on her neck" and "[s]he continued to rub her stomach" during the interview. 4 RP at 227. After talking with John, Nielsen and Pound contacted Faith over the phone. Nielsen and Pound then looked around the apartment complex and the surrounding area for Hudson. They did not find him.

III.     HUDSON'S ARREST

On March 16, around 3:00 a.m., Nielsen and Pound were in the general area of John's apartment complex after responding to an unrelated domestic violence call. While driving by the complex, Nielsen and Pound observed someone they believed to be Hudson. Nielsen ran a check of Hudson to verify his Department of Licensing photo and characteristics. Nielsen and Pound followed Hudson as he walked to a nearby smoke shop in a strip mall. The two officers went up to the smoke shop to verify the man was Hudson and ultimately determined that it was him.

Nielsen and Pound placed Hudson under arrest. Nielsen and Pound read Hudson his *Miranda*[5] warnings, which he acknowledged. After Hudson was read his rights, Nielsen and Pound informed Hudson that he was being arrested for violating the no-contact order. Hudson "*verbally acknowledged that he knew the order was in place*," 4 RP at 232 (emphasis added), but Hudson also explained that "he had contacted the Fircrest court and spoke to a judge, and the judge knew [Hudson] was living in the apartment complex."[6]  4 RP at 232.

The State charged Hudson with two counts of felony violation of a court order, two counts of assault in the fourth degree, one count of burglary in the first degree, and one count of residential

---

[5] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[6] Prior to trial, the court ruled that Hudson's statements were voluntarily made and his right to remain silent and his right to counsel were not violated.

burglary. The State also charged Hudson with several domestic violence enhancements on the basis that John was an "intimate partner" and Faith was a "[f]amily or household member." Clerk's Papers (CP) at 177-83.

IV.    TRIAL

At trial, Hudson denied having any knowledge of the 2018 no-contact order. During cross-examination, however, Hudson admitted that he knew of an existing order and claimed that he "had already resolved [the order] with the judge."[7]  5 RP at 347.  But when testifying about the conversation that he had with Officers Nielsen and Pound on March 16, Hudson confirmed that he told the officers that he was "allowed to live in [the] complex, not in [John's] home."  5 RP at 347. Hudson also admitted that he was at John's home on the day of the incident.

The jury found Hudson guilty as charged. The jury also returned special verdicts finding domestic violence for all six counts. The court subsequently vacated the residential burglary charge on the grounds of merger and double jeopardy.

V.    SENTENCING

A.    The Parties' Sentencing Recommendations

At sentencing, the State requested 176 months in confinement. The State's recommendation consisted of 116 months for burglary in the first degree, a high-end sentence within the standard range, and 60 months for the felony violation of a court order to be served consecutively. The State based its recommendation on Hudson's "lengthy criminal history"[8] and

---

[7] Contrary to Hudson's assertion at trial, there is no evidence in the record indicating that there was any action taken by the court to nullify the protection order. Moreover, John testified that she had not taken any action herself to get rid of the order.

[8] At sentencing, Hudson had an offender score exceeding 9 points.

the traumatizing effect the incident had on Faith. 8 RP at 468. The State also proposed no-contact orders for both Faith and John.

Hudson requested a downward exceptional sentence of 60 months of confinement. Defense counsel argued that a sentence of 176 months "would be egregious, and . . . would [not] promote respect for the law." 8 RP at 471. Counsel also pointed to the fact that even though it was not a valid defense, testimony from trial established that John did not object to Hudson violating the no-contact order.[9] And counsel also referenced Hudson's age, noting that any sentence would be "a significant amount of time." 8 RP at 472.

During allocution, Hudson explained that he had "not been in any kind of trouble since 2006."[10] 8 RP at 473. Hudson also referenced the fact that he had served three tours in Iraq, Okinawa, and Somalia in the Marines. And Hudson commented how he prevented a breakout at the jail when he was in custody pending trial and sentencing. When talking about Faith, Hudson acknowledged that he was "not the greatest at being a dad." 8 RP at 473. But Hudson referenced how Faith was the valedictorian of her class and a former daffodil queen. Hudson also emphasized that he would never hurt his daughter or wife.[11]

---

[9] Specifically, counsel stated, "I believe it was clear from testimony that [John] was not objecting to the violating of the no-contact order, not that that's a defense by any stretch of the imagination but just, again, looking at what sort of time Mr. Hudson should be looking at for violating the no-contact order." 8 RP at 470-71.

[10] Hudson had been convicted of 8 offenses after 2006 spanning from 2010 to 2018.

[11] Hudson was previously convicted for assaulting John by pushing her into a table in the living room where she hit her head.

B.     The Court's Decision

After hearing from both parties, the trial court reflected on the underlying facts of Hudson's conviction. The court also acknowledged that it was evident that both Faith and John struggled while testifying at trial, which indicated that the incident had a "big impact" on them. 8 RP at 481.

The court then turned to Hudson's request for an exceptional downward sentence. In line with RCW 9.94A.010, the court referenced the goals of the Sentencing Reform Act of 1981 (SRA). Then, the court proceeded to consider the applicability of any mitigating factors. When considering RCW 9.94A.535(1)(a) specifically, the court explained,

> [THE COURT:] So I want to go through—I want to talk about some of the—or look at the mitigating circumstances because [defense counsel] has argued those, and the Court needs to consider whether there are mitigating circumstances; and the statute lays out—it says the following are only—are illustrative only and are not intended to be exclusive reasons for exceptional sentences.
> So one is to a significant degree, the victim was an initiator, a willing participant, aggressor, or provoker of the incident. I guess the only evidence we have of that is that part of the evidence where it was suggested that it was an argument about—I believe about the work that—you know, housework and things of that nature, kind of doing your part which suggests that you had been to the residence more than just that one time, but . . . I don't think it would be fair to find that Ms. Valencia [sic] is an initiator based on that because once . . . there's a protection order in place, you're bound to follow it no matter what. Even if the person sends you an official invitation, you have to follow it.
> THE DEFENDANT: Yes, sir.
> THE COURT: And so I don't think that that's what we're talking about or what the legislature was talking about when they spoke of "initiator."

8 RP at 485.

Ultimately, the court determined that there was no basis for a downward departure. The court imposed a concurrent sentence of 99 months for all offenses with credit for time served. The court's sentence was based on Hudson's criminal history, the impact the crime had on Faith and John, Hudson's service in the Marines, and his efforts to prevent the breakout at the Pierce County Jail.

7

Following sentencing, the court modified the sentence and judgment to correct Hudson's sentence for counts 1 and 3 (the felony violation of the court orders) from 99 months to 60 months.[12]

Hudson appeals.

ANALYSIS

I.      SUFFICIENT EVIDENCE SUPPORTS HUDSON'S CONVICTIONS

We review challenges to the sufficiency of the evidence de novo. *State v. Berg*, 181 Wn.2d 857, 867, 337 P.3d 310 (2014). Our review, however, is "highly deferential to the jury's decision." *State v. Davis*, 182 Wn.2d 222, 227, 340 P.3d 820 (2014).

To satisfy due process, the State must prove every element of the crimes charged beyond a reasonable doubt. *State v. Smith*, 155 Wn.2d 496, 502, 120 P.3d 559 (2005). The test for determining the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found [the defendant] guilt[y] beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "A sufficiency challenge admits the truth of the State's evidence and accepts the reasonable inferences to be made from it." *State v. O'Neal*, 159 Wn.2d 500, 505, 150 P.3d 1121 (2007). Therefore, the court must draw "all reasonable inferences from the evidence in favor of the State and against the defendant." *In re Pers. Restraint of Arntsen*, 2 Wn.3d 716, 724, 543 P.3d 821 (2024). The standard of review for a challenge to the sufficiency of the evidence supporting a criminal conviction is deferential to the factfinder, and "questions of credibility, persuasiveness, and conflicting

---

[12] As a class C felony, the statutory maximum for a felony violation of a court order is 60 months. RCW 7.105.450(5); RCW 9A.20.021(c).

testimony must be left to the jury." *In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 364, 256 P.3d 277 (2011).

When we evaluate the sufficiency of the evidence supporting a conviction, we consider circumstantial evidence to be as reliable as direct evidence. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980); *see also O'Neal*, 159 Wn.2d at 506 ("Direct evidence is not required to uphold a jury's verdict; circumstantial evidence can be sufficient."). "[E]ven if the only evidence of guilt is circumstantial, the jury need only be convinced of guilt beyond a reasonable doubt." *State v. Couch*, 44 Wn. App. 26, 30, 720 P.2d 1387 (1986).

A.    Felony Violation of a Court Order

Here, Hudson argues that he was not aware of an effective protection order, and therefore, the State cannot satisfy an essential element of the offense. We disagree.

To convict a defendant of the crime of felony violation of a court order, the State must prove that (1) there was a willful contact with another, (2) a valid no-contact order prohibited such contact; and (3) the defendant had knowledge of the no-contact order. *State v. Sanchez*, 30 Wn. App. 2d 402, 406, 544 P.3d 1107 (2024). And, as applicable here, the State must also prove that the defendant has been previously convicted for violating provisions of a court order on two other occasions for the current charge to be classified as a class C felony. RCW 7.105.450(5).

"'Willfulness requires a purposeful act." *Sanchez*, 30 Wn. App. 2d at 406 (quoting *State v. Washington*, 135 Wn. App. 42, 49, 143 P.3d 606 (2006)). "'[N]ot only must the defendant know of the no-contact order[, but] they must also have intended the contact;' [i]advertent or accidental contact is not enough." *Id.* (quoting *State v. Clowes*, 104 Wn. App. 935, 944-45, 18 P.3d 596 (2001), *overruled on other grounds by State v. Nonog*, 169 Wn.2d 220, 237 P.3d 250 (2010)).

9

Evidence that a defendant acted knowingly is sufficient to prove that they acted willfully. *Clowes*, 104 Wn. App. at 944.

A defendant cannot be prosecuted if they do not know of the existence of the order. *City of Auburn v. Solis-Marcial*, 119 Wn. App. 398, 402, 79 P.3d 1174 (2003). Knowledge is defined as a person who is (1) "aware of a fact, facts, or circumstances or result described by a statute defining an offense," or (2) "has information which would lead a reasonable person in the same situation to believe that facts exist which facts are described by a statute defining an offense." RCW 9A.08.010(1)(b).

Here, there is ample evidence in the record that supports Hudson had knowledge of the protection order. First, Hudson was personally served with a copy of the protection order on the same day it was executed. Second, prior to the March 7, 2023, incident, John testified that Hudson asked her to "get rid of the order." 4 RP at 291. Third, Hudson acknowledged the existence of an order when discussing the basis for his arrest with officers Nielsen and Pound. And fourth, while testifying at trial, Hudson again acknowledged the existence of an order, but claimed that it had been "resolved." 5 RP at 346-47. But this was not the case. Other than Hudson's bald statement, there is no evidence in the record to show that the protection order had been modified or vacated; instead, the evidence shows that the protection order was in effect on the date of the incident. Moreover, while Hudson testified that he was "allowed to live in [the] complex, *not in* [*John's*] *home*," the incident occurred in John's home. 5 RP at 347 (emphasis added). Thus, sufficient evidence supports that Hudson knew of the protection order and that Hudson willfully violated several of its provisions.[13] *See Clowes*, 104 Wn. App. at 944.

---

[13] Specifically, Hudson violated the provisions prohibiting him from going to John's residence, contacting her, and "causing [John and Faith] physical harm" when he assaulted them. Ex. 4B, at 2.

Viewing the facts in the light most favorable to the State, we conclude that a rational trier of fact could have found Hudson guilty of both counts of felony violation of a court order beyond a reasonable doubt. Therefore, there was sufficient evidence to support Hudson's convictions for these counts.[14]

### B. Burglary in the First Degree

Hudson argues that the State cannot satisfy all elements for burglary in the first degree because the only evidence presented at trial was Hudson unlawfully entering John's apartment, which was insufficient to prove that he intended to commit a crime. Because Hudson subsequently developed the intent to assault John and Faith while he was at John's apartment unlawfully, we disagree.

To convict a defendant of burglary in the first degree, the State must prove that a defendant entered or remained unlawfully within a building with intent to commit a crime therein, and, "in entering or while in the building or in immediate flight therefrom, the actor or another participant in the crime (a) is armed with a deadly weapon, or (b) assaults any person." RCW 9A.52.020(1). "Regardless of whether the defendant possessed an intent to commit a crime *at the time* of the unlawful entry, if the defendant unlawfully remains" and *subsequently* develops the intent to commit a crime, a defendant can still be guilty of burglary. *State v. Allen*, 127 Wn. App. 125, 133, 110 P.3d 849 (2005) (emphasis added).

Here, there is sufficient evidence to support Hudson's conviction for burglary in the first degree. First, Hudson unlawfully entered and/or remained at John's apartment because the no-contact order explicitly prohibited Hudson from being there. RCW 9A.52.020(1). And while

---

[14] Hudson does not contest the validity of the protection order or that it was effective on the day of the incident. And at trial, he stipulated that he had previously been convicted of violating a no-contact order two times prior to March 7, 2023.

Hudson was at John's apartment unlawfully, he not only violated another provision of the no-contact order by engaging with John, but he also remained in the apartment and assaulted both John and Faith. As explained by *Allen*, Hudson's subsequent intent to assault John and Faith is enough for a burglary conviction. 127 Wn. App. at 133.

Viewing the facts in the light most favorable to the State, we conclude that a rational trier of fact could have found Hudson guilty of burglary in the first degree. Therefore, there was sufficient evidence to support Hudson's conviction.

## II.   INEFFECTIVE ASSISTANCE OF COUNSEL

Next, Hudson argues that he received ineffective assistance of counsel because his attorney failed to argue relevant mitigating factors at sentencing. Because Hudson cannot show prejudice, we conclude his ineffective assistance of counsel claim fails.

To prove ineffective assistance of counsel, a defendant must show: (1) counsel's representation was so deficient it fell "below an objective standard of reasonableness" and (2) that deficiency prejudiced the defendant. *State v. Grier*, 171 Wn.2d 17, 32-33, 246 P.3d 1260 (2011) (quoting and applying test from *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Failure to satisfy either requirement defeats the claim. *State v. Bertrand*, 3 Wn.3d 116, 128, 546 P.3d 1020 (2024).

First, "[t]he defendant must overcome 'a strong presumption that counsel's performance was reasonable.'" *Id.* at 130 (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). Legitimate trial strategy or tactics cannot serve as the basis for a claim of ineffective assistance of counsel. *Kyllo*, 166 Wn.2d at 863. A "defendant can rebut the presumption of reasonable performance by demonstrating that 'there is no conceivable legitimate tactic explaining counsel's

performance.'" *Grier*, 171 Wn.2d at 33 (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).

Second, prejudice requires showing that but for counsel's deficient performance, "there is a reasonable probability . . . the result of the proceeding would have differed." *State v. Estes*, 193 Wn. App. 479, 488, 372 P.3d 163 (2016). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 840, 280 P.3d 1102 (2012) (quoting *Strickland*, 466 U.S. at 694). Therefore, prejudice exists when there is "'a probability sufficient to undermine [the court's] confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694).

Hudson's ineffective assistance of counsel claim fails because he cannot show resulting prejudice. Critically, while there may be some basis in the record that John was a "willing participant" to the violation of the no-contact order charge, the same cannot be said for the applicability of RCW 9.94A.535(1)(a) to Hudson's burglary in the first degree conviction, which was premised on Hudson assaulting John and Faith. And because the trial court decided that Hudson's sentence for all charges would run concurrently, it would make no difference whether RCW 9.94A.535(1)(a) lowered Hudson's sentence of 60 months for the two felony violation of a court order convictions when he was sentenced to 99 months for burglary in the first degree. Hudson's overall time of incarceration would remain unchanged.

Therefore, we conclude that Hudson's ineffective assistance of counsel claim fails.

III.     The Court's Denial of Hudson's Exceptional Sentence

Hudson argues that the trial court abused its discretion by denying his request for an exceptional downward sentence. For the reasons explained above, assuming without deciding that the court's denial was erroneous, any error was harmless.

A trial court "may impose an exceptional sentence below the standard range if it finds that mitigating circumstances are established by a preponderance of the evidence." RCW 9.94A.535(1). One potential mitigating factor is, "[t]o a significant degree, the victim was an initiator, *willing participant*, aggressor, or provoker of the incident." RCW 9.94A.535(1)(a) (emphasis added).

A decision to impose a standard range sentence is generally not reviewable. RCW 9.94A.585(1). When a defendant has requested an exceptional sentence below the standard range, our "review is limited to circumstances where the [trial] court has refused to exercise discretion at all or has relied on an impermissible basis for refusing to impose an exceptional sentence below the standard range." *State v. Garcia-Martinez*, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997). We review a sentencing court's decision to deny an exceptional sentence for abuse of discretion. *State v. McGill*, 112 Wn. App. 95, 100, 47 P.3d 173 (2002); *State v. O'Dell*, 183 Wn.2d 680, 697, 358 P.3d 359 (2015).

Here, assuming without deciding that the court abused its discretion, any error was harmless. As previously discussed, there is nothing in the record to support that the mitigating factor would have resulted in a downward exceptional sentence on the burglary in the first degree charge, which carried the higher sentencing range.

Therefore, even if there was any error, we conclude that it was harmless.

IV. HUDSON'S SENTENCE FOR THE TWO COUNTS OF FELONY VIOLATION OF A COURT ORDER

Finally, Hudson argues that the trial court errored by imposing a sentence that exceeded the statutory maximum for the two counts of felony violation of a court order. Because the issue is moot, we decline to address this issue.

We do not address issues that are moot. *In re Detention of Cross*, 99 Wn.2d 373, 376-77, 662 P.2d 828 (1983). "A case is moot if a court can no longer provide effective relief." *Id.* This is based on the understanding that courts do "not consider a question that is purely academic." *State v. Ross*, 152 Wn.2d 220, 228, 95 P.3d 1225 (2004) (quoting *State v. Gentry*, 125 Wn.2d 570, 616, 888 P.2d 1105 (1995)).

Hudson's assignment of error pertaining to his sentence for the two counts of felony violation of a court order is moot. As a class C felony, the maximum term of confinement is 60 months. RCW 9A.20.021(1)(c). Hudson was originally sentenced to 99 months for each count, 38 months over the maximum. But on February 9, 2024, the trial court modified the judgment and sentence to 60 months for each count. As a result, the issue is moot.

Therefore, we decline to address this issue on appeal.

## CONCLUSION

Accordingly, we affirm Hudson's conviction.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, A.C.J.

We concur:

Lee, J.

Che, J.